BERNHARD F. MANKO AND CYNTHIA MANKO, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Manko v. Commissioner
Docket No. 25399-82
United States Tax Court
T.C. Memo 1995-10; 1995 Tax Ct. Memo LEXIS 10; 69 T.C.M. (CCH) 1636; T.C.M. (RIA) 95010; January 11, 1995, Filed Greenwald v. Manko, 840 F. Supp. 198, 1993 U.S. Dist. LEXIS 18652 (E.D.N.Y., 1993)
*10 For petitioner: Herbert Stoller. For respondent: William L. Blagg and Roland Barral. JACOBS
JACOBS
MEMORANDUM FINDINGS OF FACT AND OPINION JACOBS, Judge: This matter is before the Court on petitioners' motion for partial judgment. Respondent determined a deficiency in petitioners' 1978 Federal income tax in the amount of $ 468,689. The sole issue for decision is whether respondent is bound by an alleged settlement agreement entered into with petitioner Bernhard F. Manko. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners resided in Lighthouse Point, Florida, at the time they filed their petition. I. Arbitrage Management Investment Co.
The Arbitrage Management Investment Co. (Arbitrage Management) began operations in the mid to late 1970s. From 1978 through 1981, Arbitrage Management dealt primarily in the acquisition of straddle positions in U.S. Treasury bill options. Beginning in 1982, Arbitrage Management dealt *11 primarily in the acquisition of U.S. Government securities that were financed by repurchase agreements. Petitioner Bernhard F. Manko (petitioner) served as a principal of Arbitrage Management, and a general partner of limited partnerships that invested in Government securities acquired through Arbitrage Management (Arbitrage Management partnerships). On petitioners' 1978 joint income tax return, they deducted petitioner's distributive shares of losses (totaling approximately $ 744,000) from Arbitrage Management and Arbitrage Management partnerships for that year. On petitioners' Federal income tax returns for subsequent years, they deducted petitioner's distributive shares of losses from Arbitrage Management partnerships for years subsequent to 1978, including TEFRA years. Respondent disallowed petitioners' deductions for 1978. Although this case does not directly involve the deductions for years subsequent to 1978, such deductions played a role in settlement negotiations. II. Arbitrage Management Negotiators
Theodore Kletnick (Kletnick), an attorney in respondent's North Atlantic Regional Counsel Office, served as respondent's lead counsel in Arbitrage Management settlement *12 negotiations. Kletnick also served as respondent's docket attorney for this case from 1987 through 1990 or 1991. Howard Berman (Berman), an attorney in respondent's New York City District Counsel Office, assisted Kletnick in Arbitrage Management settlement negotiations from 1987 through 1990. Berman served as respondent's docket attorney for approximately 200 related Arbitrage Management cases. On January 15, 1987, this Court held a pretrial conference with respect to Arbitrage Management cases. At that conference, the Court designated John S. Nolan (Nolan), Barbara T. Kaplan (Kaplan), and Hugh Janow (Janow) to serve as lead counsel for Arbitrage Management partners in subsequent Arbitrage Management settlement negotiations. III. Arbitrage Management Negotiations
The Court assigned the negotiators the task of either negotiating a settlement for Arbitrage Management cases or selecting one or more Arbitrage Management test cases for litigation. Negotiations began in the spring of 1987. IV. Settlement Agreement
On January 6, 1988, the negotiators informed the Court that they had reached a "tentative settlement agreement". The negotiators advised the Court that *13 a few of the individual partners would litigate their cases. A letter from Kletnick to Nolan dated January 12, 1988, states: On December 22, 1987 we met and reached an agreement as to a method of resolving the cases involved in this project. This settlement methodology is operative so long as there is no material deviation from our understanding that we are splitting the tax stakes on an 80-20 basis (or cash plus 15 percent). Your letter dated December 29, 1987 accurately reflects the settlement methodology, except for the basis adjustment and limit.
Pursuant to this agreement, the Internal Revenue Service (IRS) would: (1) Allow the deduction of 20 percent of the challenged losses (or, at the taxpayer's option, out-of-pocket cost plus 15 percent); (2) eliminate capital gains in an amount commensurate with the disallowed losses; and (3) forgo the assertion of penalties. On January 15, 1988, Kaplan hand-delivered to Kletnick a letter that states: The following named Tax Court petitioners have agreed to accept the settlement offered by the Internal Revenue Service to partners in Arbitrage Management Project partnerships and as described in letters to you from John *14 S. Nolan, Esq. of Miller & Chevalier, dated December 29, 1987 and January 7, 1988, respectively (copies attached).
The letter lists approximately 135 Arbitrage Management partners, including petitioner, by name and docket number. Kaplan included with this letter a copy of a letter from Nolan to Kletnick, dated December 29, 1987, that describes the alleged blanket settlement offer that the partners accepted. On January 21, 1988, Kletnick sent the Court a letter that states: "Enclosed herewith are copies of listings of cases forwarded to this office reflecting acceptance of the Service's settlement offer." Petitioner's name and docket number are included on that list. On February 25, 1988, Kletnick, Nolan, and Kaplan attended another pretrial conference before the Court. At that pretrial conference, Nolan stated that "we were able to reach a basis of settlement with Mr. Kletnick, and we have communicated that to all of the partners in the Arbitrage Management partnerships". The parties advised the Court that they had settled all or virtually all of the Arbitrage Management partnership cases, and that they believed it unlikely that they would require a trial. Nolan, Kaplan, *15 and Janow believed their jobs were done, and asked to be relieved of their responsibilities as lead counsel. The Court then discharged Nolan, Kaplan, and Janow from their responsibilities as lead counsel. V. Implementation of the Settlements
Although the parties had settled the issue of the deductibility of the Arbitrage Management losses, the settlements still needed to be implemented. Under the settlements, most taxpayers had deficiencies in earlier years and overpayments in later years. Arbitrage Management partners emphasized that they wanted respondent to establish a procedure whereby the IRS could process the deficiency and overpayment years at the same time, so that the taxpayers could pay a net amount. After the February 25, 1988, pretrial conference, Kletnick sent the Court quarterly status reports of the Arbitrage Management cases. The reports described the progress of the IRS in developing settlement implementation procedures. The reports did not suggest that the IRS was continuing to contemplate the preliminary question of whether to permit deductions for Arbitrage Management losses. Respondent's counsel and Arbitrage Management partners' counsel eventually *16 agreed upon a form of closing agreement to settle the cases. Respondent entered into closing agreements in that form with many Arbitrage Management partners. Respondent, however, refused to enter into a closing agreement with petitioner. VI. Petitioner's Criminal Proceedings
In 1986, approximately 2 years before Kletnick drafted the letter confirming the settlement, a criminal investigation into petitioner's Arbitrage Management activities was in progress. Kletnick is unsure of when he learned of the criminal investigation, but believes it to be early 1987. Petitioners' negotiators knew of the possibility of a criminal investigation as of December 1987. On February 4, 1991, petitioner was convicted on multiple counts of Federal income tax fraud in violation of section 7206(1) and (2), and conspiracy to defraud the United States in violation of 18 U.S.C. section 371. VII. Respondent's Suspension of Consideration of Settlement of Petitioner's Case
On June 22, 1988, Kletnick sent petitioner a letter (suspension letter) stating that, at the request of the U.S. Attorney's office, the IRS was "suspending consideration of the settlement" *17 of petitioner's case until September 30, 1988. Kletnick never received a response to the suspension letter. Prior to the issuance of the suspension letter, the IRS had never treated the settlement of petitioner's case any differently than the settlement of cases of the other Arbitrage Management partners. Nor did the IRS ever advise petitioner that respondent would treat petitioner's distributive share of Arbitrage Management partnership losses as a nonpartnership item. At no time during the settlement negotiations that preceded Kaplan's January 15, 1988, acceptance letter did any IRS representative inform Nolan, Kaplan, or Janow that respondent's settlement offer to the Arbitrage Management partners excluded petitioner. OPINION The sole issue before the Court is whether respondent offered a blanket settlement to all Arbitrage Management partners. Petitioners contend that respondent offered such a settlement, that the partners accepted the offer, and that the parties entered into a binding settlement agreement entitling the Arbitrage Management partners to deduct 20 percent of their Arbitrage Management partnership losses. Respondent argues that the parties never entered into *18 a binding settlement agreement because respondent never offered a blanket settlement to all Arbitrage Management partners. For almost a century, it has been settled that voluntary settlement of civil controversies is in high judicial favor. Williams v. First Natl. Bank, 216 U.S. 582, 595 (1910); St. Louis Mining & Milling Co. v. Montana Mining Co., 171 U.S. 650, 656 (1898). A valid settlement, once reached, cannot be repudiated by either party, and after the parties have entered into a binding settlement agreement, the actual merits of the settled controversy are without consequence. This Court has declined to set aside a settlement duly executed by the parties and filed with the Court in the absence of fraud or mutual mistake. Stamm Intl. Corp. v. Commissioner, 90 T.C. 315 (1988); Spector v. Commissioner, 42 T.C. 110 (1964). However, a court will not force a settlement on parties where no settlement was intended. Autera v. Robinson, 419 F.2d 1197 (D.C. Cir. 1969). A settlement is a contract and, consequently, general principles *19 of contract law determine whether a settlement has been reached. Robbins Tire & Rubber Co. v. Commissioner, 52 T.C. 420, 435-436, supplemented by 53 T.C. 275 (1969). A prerequisite to the formation of a contract is an objective manifestation of mutual assent to its essential terms. Heil v. Commissioner, T.C. Memo. 1994-417; 17A Am. Jur. 2d, Contracts, secs. 27 and 28 (1991); 1 Williston on Contracts, sec. 3:5 (4th ed. 1990). Mutual assent generally requires an offer and an acceptance. 17A Am. Jur. 2d, Contracts, sec. 41 (1991). "An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." 1 Restatement, Contracts 2d, sec. 24 (1981). In a tax case, it "is not necessary that the parties execute a closing agreement under section 7121 in order to settle a case pending before this Court, but, rather, a settlement agreement may be reached through offer and acceptance made by letter, or even in the absence of a writing." Lamborn v. Commissioner, T.C. Memo. 1994-515. *20 Settlement offers made and accepted by letters are enforced as binding agreements. Haiduk v. Commissioner, T.C. Memo. 1990-506; see also Himmelwright v. Commissioner, T.C. Memo. 1988-114. During a hearing on petitioner's motion, attorneys from both sides testified. The attorneys offered contradicting testimony. They are respected members of the bar of this Court. Although the contradictory testimony of the attorneys is disturbing, we will not decide this case on the basis of their testimony, but rather we look to the documentary evidence to decide whether a settlement exists. By examining the documents, we are satisfied that respondent offered a blanket settlement to all Arbitrage Management partners, and petitioner accepted this offer. We make this determination based upon the following. On January 15, 1988, Kaplan hand-delivered a letter to Kletnick accepting the alleged blanket settlement offer on behalf of approximately 135 Arbitrage Management partners, including petitioner. Kaplan included with this letter a copy of a letter from Nolan to Kletnick dated December 29, 1987, that describes the alleged blanket *21 settlement offer that the partners accepted. Kletnick then sent the Court a letter dated January 21, 1988, that contains a list of cases "reflecting acceptance of the Service's settlement offer." This list contains petitioner's case by name and docket number. At a pretrial conference held on February 25, 1988, attorneys from both sides advised the Court that virtually all of the Arbitrage Management partners had agreed to accept the IRS settlement offer, and that a trial was unlikely. After the February 25, 1988, pretrial conference, Kletnick made quarterly written reports to the Court as to the status of the Arbitrage Management cases. These reports describe the development of procedures for implementing the settlements. They do not indicate that petitioner's case was not settled. It was not until June 1988, 5 months after Kletnick informed the Court that petitioner's case had been settled, that the first documentary evidence surfaced showing that respondent wished to treat petitioner's case differently from the cases of the other Arbitrage Management partners. At that time, Kletnick sent petitioner a letter stating that consideration of his settlement was being "suspended" *22 at the request of the U.S. Attorney's office. Respondent has conceded that, prior to Kletnick's June 1988 letter "suspending consideration" of petitioner's case, there is no documentary evidence in the IRS files indicating that respondent intended to treat petitioner differently from any other Arbitrage Management partner or that the IRS did not intend to settle with him. Moreover, Kletnick testified that he knew of the criminal investigation for approximately 1 year before entering into the settlement agreement. We are convinced that at the time of settlement respondent did not intend to treat petitioner's case differently from the cases of the other Arbitrage Management partners. It was not until June 1988, several months later, that respondent no longer wished to settle with petitioner. By then, however, respondent had already entered into a blanket settlement agreement that included petitioner. Further, prior to entering into the settlement agreement, petitioner was unaware of respondent's desire to treat petitioner differently from the other Arbitrage Management partners. We therefore hold that the parties reached a settlement agreement no later than January 21, 1988, *23 the date of the letter from Kletnick to the Court. The letter is clear on its face, and confirms the settlement. Accordingly, we will grant petitioners' motion. To reflect the foregoing, An appropriate order will be issued.